BAIRD, WILLIAMS & GREER, L.L.P.
6225 NORTH 24TH STREET, SUITE 125
PHOENIX, ARIZONA 85016
TELEPHONE (602) 256-9400

Michael C. Blair (018994)
mblair@bwglaw.net
Attorneys for plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Michael D. Peters, a married man, | No. |
| Plaintiff, | **Complaint** |
| vs. | 1. Whistleblower Protection Pursuant to Sarbanes-Oxley Act, 18 U.S.C. § 1514A; |
| LifeLock, Inc., a Delaware corporation; Kim Jones, an Ohio citizen; Cristy Schaan, an Arizona citizen, | 2. Whistleblower Protection Pursuant to Dodd-Frank Act, 15 U.S.C. § 78u-6(h); |
| Defendants. | 3. Defamation |
| | **(Jury Trial Demanded)** |

For his complaint against defendants, plaintiff alleges as follows:

**- Jurisdiction and Venue -**

1.  This action against defendant LifeLock, Inc., arises under the whistleblower protection provisions of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, and the Dodd-Frank Act, 15 U.S.C. § 78u-6(h)(1)(A). This court has subject matter jurisdiction pursuant to 18 U.S.C. § 1514A(b)(1)(B) and 28 U.S.C. § 1331.

2.  This action against defendants Kim Jones and Cristy Schaan seeks relief for Arizona state law claims for defamation. This court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

3. Venue is proper pursuant to 18 U.S.C. § 1514A(b)(1)(B) and 28 U.S.C. § 1391(b) because the events described herein occurred within this district.

### - Parties -

4. Plaintiff Michael D. Peters is a married man who is a citizen of Arizona.

5. Peters is an internationally recognized authority on information technology security. He has published numerous books and articles on the subject and has been a keynote speaker at several security conferences throughout the United States and overseas.

6. Peters is a member of the Information Systems Security Association (ISSA) Hall of Fame. Only 42 people in the world have been inducted. He was inducted for demonstrating a superior level of expertise, effectiveness, and dedication to the advancement of the cyber security profession. Peters is also a fellow at the ISSA. This is reserved for only 2% of all international members based on their contributions to the cyber security profession. Peters is also certified as a Chief Information Security Officer, as an Information System Security Professional, as an Information Security Manager, as a Computer Examiner, and in Risk and Information Systems Control.

7. Defendant LifeLock, Inc., is a Delaware corporation headquartered in Tempe, Arizona.

8. Defendant Kim Jones is a citizen of Ohio.

9. Defendant Cristy Schaan is a citizen of Arizona.

### - Demand for Jury Trial -

10. Peters demands a jury trial pursuant to 18 U.S.C. § 1514A(b)(2)(E).

### - Factual Background -

11. In early 2013, Peters was working as the Chief Information Security Officer ("CISO") for CrossView, Inc., in Midland, Georgia. He was contacted by a recruiter looking to fill a CISO position at LifeLock. Peters was intrigued with this opportunity so he decided to pursue it.

12. What followed was an intense screening and vetting process by LifeLock. This included more than twelve face-to-face interviews, numerous telephonic interviews, drug testing, a thorough review of eight years of Peters's tax returns, thorough criminal and civil background

checks, and background checks on his education and employment. Indeed, the screening process LifeLock used was more detailed and invasive than when Peters obtained a secret clearance from the United States Air Force. All checks and testing resulted in a clear or satisfactory result.

13.    LifeLock offered Peters the position of CISO on May 23, 2013. He accepted the position on May 24. The offer was contingent upon the successful completion of background checks and drug testing. A third party, TalentWise, performed those background checks and drug testing for LifeLock. Peters successfully passed them on May 17 and May 30, respectively.

14.    Peters was to be paid an annual base salary of $180,000.00 plus benefits and a stock option grant of 35,000 shares. Peters also had the opportunity to receive an annual bonus of up to 25% of his base salary.

15.    In reliance upon LifeLock's offer, Peters resigned from his job in Georgia, sold his home there at a loss, forfeited prepaid tuition for private schools for his children, and then uprooted his family and moved to Arizona, a place where they had no family and knew no one.

16.    Peters started work on July 1, 2013, as LifeLock's CISO.

17.    Upon commencing work, Peters immediately began an initial risk assessment at LifeLock. Before his hiring, LifeLock had never conducted a bona fide risk assessment. Even in the preliminary stages of the risk assessment, Peters began to discover many instances of illegal and incompetent practices that constituted fraud against LifeLock's shareholders. These include, but are not limited to, the following:

    a.    LifeLock's manager of database administration, Jacqueline Hufford-Jensen, signed a Sarbanes-Oxley audit verifying that the information contained in that audit was true and correct even though the time period she was attesting to predated her hiring date at LifeLock.

    b.    LifeLock's director of internal audits, Tony Valentine, had "collected" evidence from the information security team that existed prior to Peters's arrival related to access logging, audit logging, audit log reviews, network security controls, and data leakage controls that either (1) did not truly exist

    because the technology was still in boxes; or (2) LifeLock lacked the staff to keep track of everything; or (3) such reviews were not actually conducted.

  c. LifeLock employee Dave Bridgman told Peters that LifeLock's current practice was to manipulate the customer alerts sent to its elderly customers. LifeLock would turn off or reduce the services alerting elderly customers to reduce the call volume received by LifeLock's customer support center. Peters believed this was fraudulent since it sold its services to the general public without any disclosure that alert services would be limited for certain segments of the population.

  d. LifeLock was in the process of finalizing a new product offering called PassLock. This system was designed to allow customers to include their passwords for up to ten accounts. PassLock would then crawl through hundreds of internet sites to check the username and password supplied by the customer and report back to the customer. The problem was that the database was not being protected with industry-grade encryption. The database was predicted to contain millions of customer credentials that would be devastating to consumers if a breach occurred. Moreover, the system was going to utilize a third-party cloud hosting business without that third party's knowledge or consent. Technically, the PassLock crawling would be identified by most service providers as intrusive, illegal, illegitimate, and then blacklist the source address. The unknowing third-party cloud hosting service would suffer significant business damage and LifeLock could face significant liability thereby damaging its shareholders.

 18. LifeLock's security posture was at high risk. Peters determined that LifeLock's internal capacity for governance implemented (policies, audit plan, change controls, architectural review, etc.) was at 47% of the minimum to protect LifeLock's customers and their sensitive information. If a security breach occurred, LifeLock's shareholders would be damaged.

19. Peters determined that LifeLock's technological security readiness (intrusion prevention, data leakage, data encryption, access controls, physical security, etc.) was only at 27% of the minimum to protect LifeLock's customers and their sensitive information. If a security breach occurred, LifeLock's shareholders would be damaged.

20. Peters determined that LifeLock's security vigilance (vulnerability testing, auditing, monitoring, awareness education, event logging, incident management, etc.) was at 0% of the minimum to protect LifeLock's customers and their sensitive information. If a security breach occurred, LifeLock's shareholders would be damaged.

21. A large part of this problem was staffing. LifeLock only had two people responsible for security. One individual lacked technical skill and only had minimal security experience; the other was fresh out of college and had technical skills, but lacked experience if a data breach occurred. Peters concluded that millions of customers were at risk given the data LifeLock possesses and is incapable of protecting.

22. Peters asked LifeLock to immediately hire at least 12 information security professionals to get LifeLock to the minimum level necessary for basic information security protection. LifeLock said it might hire two people during the next 12 months, but full staffing would take years, if at all.

23. On or about July 9, 2013, Peters met with LifeLock's CFO, Chris Power. Peters advised Power of what he was discovering as part of his ongoing initial risk assessment described in paragraphs 17–21 above. Power did nothing in response.

24. On or about July 12, 2013, Peters met with his direct superior, LifeLock's chief information officer, Rich Stebbins. Peters advised Stebbins of what he was discovering as part of his ongoing initial risk assessment described in paragraphs 17–21 above. Stebbins did nothing in response.

25. LifeLock's upper management decided to fire Peters after he met with Power and Stebbins and conveyed to them the preliminary results of his ongoing initial risk assessment.

26. LifeLock's upper management directed Michelle Deutsch, LifeLock's in-house special counsel for labor and employment, to try to find grounds to terminate Peters's employment at LifeLock.

27. In mid-July 2013, Deutsch contacted CrossView, Inc., about Peters's work there. Deutsch also contacted another of Peters's former employers, Fifth Third Processing Solutions, now known as Vantiv, in Ohio.

28. When Deutsch contacted Vantiv, she was incorrectly told that Peters had been fired. This was and is a false statement. Peters resigned from Fifth Third Processing Solutions pursuant to a signed separation agreement.

29. On his employment application with LifeLock, Peters stated that he resigned from Fifth Third Processing Solutions and moved to Georgia with his U.S. Army wife to keep his family together. This statement is true because his family did, in fact, move to Georgia and, pursuant to the separation agreement with Fifth Third Processing Solutions, he had resigned from that entity.

30. Based on the false information Deutsch obtained from Vantiv, LifeLock decided it had cause to terminate Peters by claiming that he made a misrepresentation on his employment application regarding his departure from Fifth Third Processing Solutions.

31. LifeLock fired Peters on July 29, 2013.

32. Peters wrote a letter to LifeLock's CEO, Todd Davis, on July 30 to try to get his job back. It did not happen. Instead, on August 1, LifeLock's attorney sent a letter to Peters advising that he had been terminated for cause because of false information on his employment application.

**- Administrative Actions -**

33. Peters filed a complaint with the FTC against LifeLock on August 19, 2013. That complaint is still under investigation.

34. Peters filed a complaint with the SEC against LifeLock on August 19, 2013. That complaint is still under investigation.

35. Peters filed a whistleblower complaint with the U.S. Department of Labor under the Sarbanes-Oxley Act on August 23, 2013, against LifeLock and Vantiv. OSHA investigates

Sarbanes-Oxley complaints. An OSHA mediator resolved the complaint between Peters and Vantiv. A signed settlement agreement was entered between Peters and Vantiv on September 27, 2013.

36. The Sarbanes-Oxley complaint against LifeLock was still active. However, more than 180 days has passed since the filing of the complaint so, on February 25, 2014, Peters notified OSHA of his intent to file suit in district court.

**Count I - Violation of Whistleblower Provisions of Sarbanes-Oxley Act Against LifeLock**

37. Peters incorporates paragraphs 1–36 contained herein.

**- Peters Engaged In Protected Activity -**

38. While conducting his initial risk assessment, and based on his extensive experience and training in the information technology security world, Peters both subjectively and objectively believed that LifeLock was committing fraud against its shareholders as described in paragraphs 17–21, *supra.*

**- Knowledge of Decision Maker -**

39. Peters disclosed the preliminary findings from his ongoing initial risk assessment to both Stebbins and Power, his supervisors, on separate occasions and conveyed to them his belief that LifeLock was engaging in fraudulent activities.

40. Stebbins and Power conveyed the information they received from Peters to other members of LifeLock's upper management so LifeLock's decision makers knew about Peters's preliminary findings from his ongoing initial risk assessment.

41. LifeLock's upper management decided that Peters had to be fired, so they tasked Deutsch to find a basis to do so.

**- Unfavorable Personnel Action -**

42. LifeLock fired Peters on July 29, 2013.

**- Contributing Factor -**

43. LifeLock conducted an exhaustive background search on Peters as part of its vetting process before offering him the job as its CISO. LifeLock even hired an outside third-party entity, TalentWise, to conduct background checks on Peters's education, employment, civil and criminal history, and drug testing.

44. TalentWise specifically contacted Fifth Third Processing Systems to verify Peters's employment there and the information he provided on his LifeLock application. TalentWise's employment check with Fifth Third Processing Solutions came back clear.

45. Notwithstanding the clean background checks, Deutsch started her own background check in mid-July immediately after Peters had his separate meetings with Stebbins and Power.

46. LifeLock had no reason to contact Peters's former employers in mid-July because TalentWise's background check on his employment had been completed in May before he was even hired. Nonetheless, Deutsch contacted an unknown individual at Vantiv and was given false information about Peters's employment at Fifth Third Processing Solutions. LifeLock believed this was sufficient to claim that Peters had provided false information on his employment application.

47. LifeLock fired Peters approximately two weeks after he reported the fraudulent conduct he was discovering during his initial risk assessment.

### - LifeLock's Pretextual Defense -

48. LifeLock claims it fired Peters because of false information Deutsch obtained when she contacted Vantiv about Peters's employment at Fifth Third Processing Solutions. However, Vantiv has acknowledged that Peters was not fired, but that he resigned. Any alleged statements to the contrary are false. Deutsch never contacted Peters to get his side of the story. Instead, LifeLock used the false information Deutsch obtained as a pretext to fire him.

49. Peters learned through the OSHA investigation that defendant Cristy Schaan at LifeLock surreptitiously conducted her own private investigation of Peters's prior employment at Fifth Third Processing Solutions. Schaan was the interim CISO at LifeLock before Peters was hired. She applied for the permanent CISO position also, but was passed over in favor of Peters. On July 1, 2013, she contacted defendant Kim Jones, Vantiv's CISO, to find out what, if anything, he personally knew about Peters.

50. Jones stated that he did not know Peters. He said that Peters was the predecessor CISO to Jones's predecessor at Vantiv. Notwithstanding, Jones then proceeded to tell Schaan all sorts of false and negative things about Peters. Jones has since admitted that he did not contact anyone at Vantiv legal or Vantiv human resources because he did not want his comments to be construed as

an official Vantiv response to Schaan's inquiry. Nonetheless, he provided this defamatory hearsay information via email to Schaan. She kept this negative information to use against Peters at a future date if the opportunity arose.

51. When Schaan discovered that LifeLock was about to fire Peters, she contacted Stebbins on July 26 and provided the defamatory hearsay email from Jones to try to seal Peters's fate. Peters's termination just three days later opened the door for Schaan to become LifeLock's CISO.

52. Within thirty days after firing Peters, LifeLock hired Schaan as its new CISO.

53. LifeLock has also claimed in response to Peters's OSHA complaint that Peters was terminated for inappropriate behavior because he allegedly "hit upon" a female employee. That allegation is false. Furthermore, the employee who made that allegation was Jacqueline Hufford-Jensen, the same employee who signed the fraudulent Sarbanes-Oxley audit. Hufford-Jensen made these false allegations to get Peters fired to cover up her signing of the fraudulent audit.

54. LifeLock's purported reasons for terminating Peters based on allegedly false information on his application and alleged improper conduct towards Hufford-Jensen were just a pretext to cover up the real reason for his termination: that he reported to his supervisors about the illegal, fraudulent, and incompetent business practices relating to fraud against shareholders that were occurring at LifeLock.

55. As a protected whistleblower, and pursuant to 18 U.S.C. § 1514A(c), Peters is entitled to all relief necessary to make him whole.

Wherefore, Peters prays for entry of judgment against LifeLock as follows:

A. pursuant to 18 U.S.C. § 1514A(c)(2)(B), for an order awarding Peters his back pay at the agreed upon salary with interest at the highest rate allowable by law. Peters also seeks the value, as of July 1, 2013, of the 35,000 stock options and 25% bonus granted to him as part of his compensation package;

B. pursuant to 18 U.S.C. § 1514A(c)(2)(C), for an order awarding Peters the special damages he sustained due to LifeLock's termination of his employment. These special damages include, but are not limited to:

1        i.    all costs and expenses in an amount to be determined at trial that Peters incurred in moving his family from Georgia to Arizona in reliance upon LifeLock's offer of employment. These include the loss Peters sustained when he sold his home in Georgia, the forfeiture of prepaid school tuition, and the actual moving expenses he incurred to physically move his family and belongings across the country;

       ii.    damages in an amount to be determined at trial due to the emotional harm and anxiety Peters has suffered after moving his family across the country only to be fired just 29 days into his new job;

       iii.   all damages to Peters's reputation in an amount to be determined at trial;

       iv.   all of Peters's litigation costs, expert witness fees, and reasonable attorney fees incurred herein;

C.    for an award of interest on all amounts awarded at the highest rate allowable by law from the date of judgment until paid in full; and

D.    for such further relief as this court deems appropriate.

**Count II - Violation of Whistleblower Provisions of Dodd-Frank Act Against LifeLock**

56.    Peters hereby incorporates paragraphs 1–55 herein.

57.    In mid-July 2013, Peters reported to both Stebbins and Power and others of the illegal and incompetent practices that constituted fraud against LifeLock's shareholders as described in paragraphs 17-21, *supra*.

58.    As described herein, Peters was fired on July 29 after reporting to his superiors those illegal and incompetent practices that constituted fraud against LifeLock's shareholders.

59.    Peters filed a complaint against LifeLock with the SEC on August 19, 2013.

60.    Pursuant to 15 U.S.C. § 78u-6(h)(1)(A)(i) and (iii), Peters is a whistleblower. LifeLock's termination of Peters violates the Dodd-Frank Act's protection for whistleblowers.

Wherefore, Peters prays for entry of judgment against LifeLock as follow:

A.    pursuant to 15 U.S.C. § 78u-6(h)(1)(C)(ii), for an order awarding Peters two times his back pay at the agreed upon salary with interest at the highest rate allowable by law. Peters also

seeks the value, as of July 1, 2013, of two times the 35,000 stock options and 25% bonus granted to him as part of his compensation package;

  B. pursuant to 15 U.S.C. § 78u-6(h)(1)(C)(iii) for an order awarding Peters all of his litigation costs, expert witness fees, and reasonable attorney fees incurred herein;

  C. for an award of interest on all amounts awarded at the highest rate allowable by law from the date of judgment until paid in full; and

  D. for such further relief as this court deems appropriate.

### Count III - Defamation Against Kim Jones

61. Peters hereby incorporates paragraphs 1–60 herein.

62. On July 2, 2013, Jones sent an email to Schaan at LifeLock responding to her request for information about Peters.

63. Jones's July 2 email contains false information. Jones falsely stated that Peters was fired from Fifth Third Processing Solutions and that he was walked out of the building without being allowed to return to his office to retrieve his personal belongings. In fact, Peters resigned.

64. Jones's July 2 email contains defamatory statements that bring Peters into disrepute, contempt, or ridicule or that impeach his honesty, integrity, virtue, or reputation.

  a. Jones described Peters's relationship building skills as being virtually non-existent;

  b. Jones said that Peters has a reputation for being disingenuous in his promotional activities by overstating his accomplishments; and

  c. Jones stated that Peters engaged in inappropriate actions.

65. Jones has since admitted that he did not know Peters when Schaan asked about him. Jones has also admitted that he deliberately did not request any information about Peters from Vantiv's legal or human resources departments because he did not want his response to be misconstrued as an official Vantiv communication. In responding to Schaan's request, Jones was acting outside the scope of his employment at Vantiv.

66. Jones acted in reckless disregard of the truth or falsity of the statements he made about Peters to Schaan because he consciously disregarded whether that information was true or false.

Instead of verifying the information, Jones relied upon community gossip and conveyed that to Schaan as if it were true.

67.   Jones failed to use reasonable care in determining whether his statements about Peters were true or false when he sent his July 2 email to Schaan.

68.   On July 26, 2013, Schaan provided Stebbins with Jones's July 2 email and conveyed its contents as being true. LifeLock considered Jones's July 2 email as part of the decision to terminate Peters.

Wherefore, Peters prays for entry of judgment against defendant Kim Jones as follows:

A.   for an order awarding Peters damages in an amount to be determined at trial due to Jones's defamatory July 2 email. These damages include, but are not limited to:

    i.   Peters's loss of employment at LifeLock;

    ii.   Peters is known worldwide for his work in information technology security. He is among the top 1% of all followed profiles on the social network LinkedIn. Working at LifeLock for only 29 days has damaged Peters's reputation and standing in the community;

    iii.   Peters has suffered emotional distress, humiliation, inconvenience, and anxiety as a result of Jones's defamatory July 2 email; and

    iv.   all monetary losses Peters has experienced and those that are reasonably probable for him to experience in the future;

B.   to the extent Jones acted consciously and with reckless disregard of the truth of the statements contained in his July 2 email, Peters seeks an award of punitive damages;

C.   for an award of interest on all amounts awarded at the highest rate allowable by law from the date of judgment until paid in full; and

D.   for such further relief as this court deems appropriate.

### Count IV - Defamation Against Cristy Schaan

69.   Peters hereby incorporates paragraphs 1–68 herein.

70.   As stated above, before Peters was hired as LifeLock's CISO, Schaan was the interim CISO. Much of the illegal and incompetent practices Peters discovered during his ongoing initial

risk assessment occurred while Schaan was interim CISO. She applied for the permanent position, but it was given to Peters. When Peters began work at LifeLock, Schaan reported to him.

71. On July 1, 2013, Schaan asked her friend, defendant Kim Jones, if he knew anything about Peters and his employment at Fifth Third Processing Solutions.

72. Jones responded on July 2 with the defamatory hearsay email described in paragraphs 61–68, *supra*.

73. Based on the content of Jones's July 2 email, Schaan knew or had reason to know that it was defamatory because it brought Peters into disrepute, contempt, or ridicule or it impeached his honesty, integrity, virtue, or reputation.

74. Schaan kept Jones's July 2 email to herself until the end of July when she found out that LifeLock was considering terminating Peters.

75. On July 26, 2013, Schaan gave Stebbins a copy of Jones's July 2 defamatory email.

76. Schaan acted in reckless disregard of the truth or falsity of the statements in Jones's email about Peters when she re-published his defamatory email to Stebbins because she consciously disregarded whether that information was true or false. Instead, she wanted Peters to get fired so she could be LifeLock's CISO.

77. Schaan failed to use reasonable care in determining whether the statements in Jones's July 2 email about Peters were true or false when she re-published his defamatory email to Stebbins.

78. When Schaan provided Stebbins with Jones's July 2 email, she conveyed its contents as being true. The information Schaan provided to Stebbins was considered by LifeLock as part of the decision to terminate Peters.

Wherefore, Peters prays for entry of judgment against defendant Cristy Schaan as follows:

A. for an order awarding Peters damages in an amount to be determined at trial due to Schaan's re-publication of Jones's defamatory July 2 email. These damages include, but are not limited to:

    i. Peters's loss of employment at LifeLock;

    ii. Peters is known worldwide for his work in information technology security. He is among the top 1% of all followed profiles on the social network

      LinkedIn. Working at LifeLock for only 29 days has damaged Peters's reputation and standing in the community;

   iii. Peters has suffered emotional distress, humiliation, inconvenience, and anxiety as a result of Schaan's re-publication of Jones's defamatory July 2 email; and

   iv. all monetary losses Peters has experienced and those that are reasonably probable for him to experience in the future;

 B. to the extent Schaan acted consciously and with reckless disregard of the truth of the statements contained in Jones's July 2 defamatory email when she republished it to Stebbins on July 26, Peters seeks an award of punitive damages;

 C. for an award of interest on all amounts awarded at the highest rate allowable by law from the date of judgment until paid in full; and

 D. for such further relief as this court deems appropriate.

Dated this 19th day of March 2014.

           /s/   Michael C. Blair
           Michael C. Blair
           *Baird, Williams & Greer, LLP*
           6225 North 24th Street, Suite 125
           Phoenix, Arizona 85016
           Attorneys for plaintiff